COMMONWEALTH of Pennsylvania, Appellee,

v.

William Harry SNYDER, Appellant.

Superior Court of Pennsylvania.

Argued Dec. 5, 2012.
Filed Jan. 18, 2013.

Frank N. Paganie, Beaver, for appellant.

Chad R. Parks, Assistant District Attorney, Beaver, for Commonwealth, appellee.

BEFORE: PANELLA, ALLEN, and STRASSBURGER,* JJ.

* Retired Senior Judge assigned to the Superior Court.

OPINION BY ALLEN, J:

William Harry Snyder, ("Appellant"), appeals from the judgment of sentence entered following his conviction on one count of obstructing the administration of law enforcement or other governmental official after Appellant divulged the plans of the Aliquippa Police Department to acquire search warrants for residences in the Valley Terrace apartment complex.[1] We affirm the judgment of sentence.

The pertinent facts and procedural history may be summarized as follows: Shortly after midnight on December 28, 2010, Detective Donald Anthony Couch of the City of Aliquippa Police Department received a report that a fatal shooting had occurred in Aliquippa, Pennsylvania, and that the victim, Robert Hall, was discovered in a parking lot at the Valley Terrace apartment complex. N.T., 9/15/11, at 5–6. Valley Terrace employed Victory Security Company to provide armed security guards at the apartment complex, and shortly after the shooting, Detective Couch learned that three Valley Terrace Security Officers had witnessed part of the activity leading up to the shooting. *Id.* at 7–8. Detective Couch commenced an investigation of the homicide and on December 29, 2010, convened a meeting to discuss the status of the investigation. Because of a history of good rapport between the City of Aliquippa Police and the Victory Security guards at Valley Terrace, Detective Couch invited three security guards from Victory Security, including Appellant, to participate in the December 29, 2010 meeting as "witnesses" and to "shed light" on the investigation. *Id.* at 9–14. Also present at the meeting were several other Aliquippa Police officers, and several Beaver County Detectives. *Id.* Detective Couch

1. 18 Pa.C.S.A. § 5101.

informed the Victory Security guards that all discussions taking place at the meeting were highly confidential. *Id.* at 13. Among the matters discussed at this meeting was Detective Couch's intent to obtain search warrants for several Valley Terrace apartments, including a search warrant for the apartment of an individual named Roger Henderson. *Id.* at 12.

At the time of the December 29, 2010 meeting with Detective Couch, Appellant had been employed as a security guard at Valley Terrace for approximately three months. N.T., 9/14/11 at 61. On January 1, 2011, three days after the meeting with Detective Couch, Appellant became involved in a verbal altercation with Thomas Allman and James English, his supervisors at Victory Security. N.T., 9/14/11, at 54–56; 71–74. As a consequence, Appellant was discharged from his job duties as a security guard at Valley Terrace. *Id.* at 63. That evening, Appellant visited the apartment of Roger Henderson, a Valley Terrace resident, and informed Mr. Henderson that the Aliquippa Police would be acquiring search warrants for Mr. Henderson's apartment as well as several other residences in the Valley Terrace apartment complex. *Id.* at 81–82. Mr. Henderson informed his mother, with whom he shared the residence, and several other individuals, about the impending search warrants. *Id.* at 82.

The following day, Mr. Henderson spoke with Mr. Allman and Mr. English, Appellant's supervisors with Victory Security, about his conversation with Appellant. *Id.* at 56. Following the conversation with Mr. Henderson, Mr. English and Mr. Allman informed the Aliquippa Police Department that the search warrants had been compromised. *Id.* at 58. Detective Couch instructed Mr. Allman to complete a detailed report and submit it to the Aliquippa

police, and Mr. Allman complied. N.T., 9/15/11, at 16. Detective Couch then interviewed Mr. Allman, Mr. English and Mr. Henderson, after which the Detective consulted with the District Attorney's office, who recommended that Appellant be charged with violating 18 Pa.C.S.A. § 5101. *Id.*

On January 3, 2011, Detective Couch contacted Appellant and asked him to come to the Aliquippa Police Station. On January 4, 2011, at 9:30 a.m., Appellant arrived at the police station. At the station, Detective Couch led Appellant to a conference table. Without issuing *Miranda*[2] warnings, Detective Couch began to explain to Appellant that he was aware that Appellant had divulged the plans to execute search warrants, that he had spoken with and interviewed the people involved, and that he had a warrant for Appellant's arrest. Appellant then informed Detective Couch that he had told Mr. Henderson about the search warrants because he was mad at his supervisors. N.T., 9/14/11, at 15; N.T., 9/15/11, at 17–20. Detective Couch then provided Appellant with *Miranda* warnings, after which Appellant indicated that he would not make any more statements, and declined to sign a *Miranda* waiver. Appellant was arrested and transported to a Magisterial District Judge for arraignment. N.T., 9/15/11, at 22.

Thereafter, Detective Couch decided that it would not be practical to execute the search warrants because of Appellant's having tipped off Mr. Henderson, which greatly decreased the likelihood of finding evidence. *Id.* at 25–26. Moreover, Detective Couch was concerned that the search warrants would be dangerous to execute without the element of surprise. Detective Couch therefore opted not to execute the

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)

search warrants and testified that Appellant's actions significantly compromised his investigation into the death of Robert Hall.[3] See also Trial Court Opinion, 3/8/12, at 1–3.

On February 7, 2011, Appellant was charged with one count of Obstructing the Administration of Law Enforcement of Other Governmental Official, 18 Pa.C.S.A. § 5101. On September 14, 2011, prior to the commencement of jury trial, Appellant made an oral motion to suppress the incriminating statements he had made to Detective Couch on January 3, 2011. Following a hearing, the trial court denied Appellant's motion. Jury trial commenced that same day. At trial, the Commonwealth presented the testimony of Detective Couch, Thomas Allman, James English, and Roger Henderson. Appellant opted not to testify at trial. On September 15, 2011, the jury found Appellant guilty, and on November 9, 2011, the trial court sentenced Appellant to serve one year of probation. No post-sentence motions were filed. Appellant filed a timely notice of appeal on December 7, 2011. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

I. WHETHER THE TRIAL COURT ERRED IN NOT SUPPRESSING THE APPELLANT'S INCRIMINATING STATEMENT MADE TO DETECTIVE SERGEANT COUCH WHILE IN THE SETTING OF CUSTODIAL INTERROGATION PRIOR TO BEING GIVEN *MIRANDA* WARNINGS?

II. WHETHER THE COMMONWEALTH PRESENTED SUFFICIENT EVIDENCE TO CONVICT APPELLANT OF OBSTRUCTING ADMINISTRATION OF LAW OR OTHER GOVERNMENTAL FUNCTION BY INTENTIONALLY OBSTRUCTING, IMPAIRING OR PERVERTING THE ADMINISTRATION OF LAW BY UNLAWFUL PHYSICAL INTERFERENCE OR OBSTACLE OR BY BREACH OF AN OFFICIAL DUTY?

Appellant's Brief at 6.

■ In his first issue, Appellant argues that the trial court erred in failing to suppress the incriminating statements he made to Detective Couch. Appellant's Brief at 14–17. Our appellate standard of review of suppression motions is as follows:

> Our standard of review of a denial of suppression is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

---

**3.** The trial court indicated in its opinion that on September 26, 2011, Dejuan Hill was charged with homicide for the death of Robert Hall in Beaver County Case # 1980–2011. However, we are unable to find any confirmation of this fact in the record before us. At trial Detective Couch testified that because of Appellant's actions in divulging information about the search warrants, the homicide investigation into the death of Robert Hall was critically impaired and Detective Couch was unable to file any criminal charges in that matter. N.T., 9/15/11, at 27.

*Commonwealth v. Reppert,* 814 A.2d 1196, 1200 (Pa.Super.2002) (citations omitted).

■ Appellant argues that his statements to Detective Couch should have been suppressed because he was in police custody and subject to police interrogation at the time he made the incriminating statements, but was not provided with *Miranda* warnings. Appellant's Brief at 14–17. "The law is clear that *Miranda* is not implicated unless the individual is in custody *and* subjected to interrogation." *Commonwealth v. Umstead,* 916 A.2d 1146, 1149–1152 (Pa.Super.2007) (citations omitted)(emphasis added); *see Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed:2d 297 (1980).

■ "Police detentions only become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of formal arrest ... [T]he test focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted." *Commonwealth v. Baker,* 963 A.2d 495, 501 (Pa.Super.2008) (citations omitted).

■ Interrogation is defined as "police conduct calculated to, expected to, or likely to evoke admission." *Commonwealth v. Umstead,* 916 A.2d 1146, 1152 (Pa.Super.2007) (citations omitted); *see Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)("the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response").

Neither the trial court nor the Commonwealth contest Appellant's assertion that he was in custody. Rather, the issue on appeal centers on whether Appellant was subjected to an interrogation. The trial court, concluding that Appellant was *not* subjected to an interrogation, explained:

[Upon Appellant's arrival at the police station], Detective Couch briefly informed [Appellant] of the information he had obtained indicating that Appellant had tipped off Roger Henderson to the future search warrants. His informational statement was brief. Detective Couch did nothing to indicate that [Appellant] was intended to respond and as soon as [Appellant] spoke, Detective Couch stopped him and provided *Miranda* warnings, evidencing that Detective Couch was not intending to elicit a statement from [Appellant] prior to giving *Miranda* warnings.

Trial Court Opinion, 3/8/12, at 7. Accordingly, the trial court concluded that since Detective Couch did not use words or actions that he should have known were reasonably likely to elicit an incriminating response, Appellant was not subject to an interrogation and therefore *Miranda* warnings were not required.

Appellant, however, cites *Commonwealth v. DeJesus,* 567 Pa. 415, 787 A.2d 394 (2001) abrogated on other grounds, *Commonwealth v. Cousar,* 593 Pa. 204, 928 A.2d 1025 (2007) in support of his claim that he was subjected to an interrogation. We find *DeJesus* controlling.

In *DeJesus,* without administering *Miranda* warnings, police officers took the defendant into custody and interviewed him over a period of several hours. During the interview, the police told the defendant that two other people had made statements implicating the defendant in a shooting, informed the defendant about the nature of the statements implicating him, apprised the defendant, on several occasions, of the charges that the Commonwealth was prepared to bring against him, and showed the defendant the statements from the persons who had implicat-

ed him, after which the defendant made incriminating statements. *DeJesus,* 787 A.2d at 400–401. Our Supreme Court held, in *DeJesus,* that although the police officers words were intended to be informational, they were also reasonably likely to elicit an incriminating response from the defendant, and as such, constituted the functional equivalent of an interrogation. *DeJesus,* 787 A.2d at 403–404. The Court explained that the police officers should have known that their comments and conduct were reasonably likely to evoke an effort on the defendant's part to defend himself and give his own version of his involvement in the crimes at issue, such that the defendant should have been administered *Miranda* warnings. *Id.See also Commonwealth v. Gaul,* 590 Pa. 175, 912 A.2d 252, 256 (2006)("the linchpin of the *Miranda* analysis is the perception of the suspect and the constructive knowledge of the police [and] [m]erely because a police officer intended the encounter to be informational does not mean that it could not also constitute an interrogation"). Accordingly, the Court concluded in *DeJesus* that the trial court erred in holding that the defendant's incriminating statement was a "spontaneous, voluntary response" to the police officer's remarks, and that *Miranda* warnings were required at the outset.

Here, Appellant argues that the facts of this case are analogous to *DeJesus.* Appellant maintains that, as in *DeJesus,* Detective Couch subjected him to the functional equivalent of an interrogation because the detective's words and conduct were reasonably likely to elicit an incriminating response. Appellant argues, therefore, that *Miranda* warnings were warranted, absent which his incriminating statements should have been suppressed. We agree with Appellant. *See Commonwealth v. Charleston,* 16 A.3d 505 (Pa.Super.2011) ("this Court is bound by the precedent established by the Pennsylva-

nia Supreme Court in *DeJesus,* which followed *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285 [84 L.Ed.2d 222] (1985)").

At the suppression hearing, Detective Couch testified as follows regarding Appellant's incriminating statements:

> Detective Couch: [Appellant] walked into the station. We all sat down at the table outside of the Chief's office. It's a conference table, if you will. I began to explain everything I had heard and learned since that Sunday evening. I told [Appellant] that I was notified by his supervisor that he allegedly made these statements, told him that we had interviewed the people involved, that he allegedly made these statements to. We received written statements. I told them the investigative team subsequently discussed the matter with the district attorney's office, and as a result, we had a warrant for his arrest for obstruction. His comment at that point in time was, I only did it because I was mad at my supervisor; it was stupid; I admit it.
>
> I cut him off and said stop, listen. I said, I'm going to read you your *Miranda* rights; I'll have you fill them out, sign them and we'll start an interview.... He filled out the top part after I read him his *Miranda* rights, but when I started to get back into his statement, he refused to say anything more. I said, that's fine. And he was taken to arraignment.
>
> \* \* \*
>
> When I sat him down and explained to him ... everything from Sunday night leading up to getting the warrant the previous day leading up to his arrest, before I could say anything else or ask him any questions or explain to him about *Miranda* or any-

thing like that, it's him that made the—I cut him off and said, before we go any further, I'm going to read you your rights. Because ... I got the indication that he was going to cooperate and admit that he was doing that. But after reading him his *Miranda* rights, he said, well, I said what I said, I'm not going to write any statements.

\* \* \*

Assistant District Attorney: I'll show you what I marked as Commonwealth's Exhibit No. 1. Can you identify that?

Detective Couch: This is a copy of our police department statement[of] *Miranda* rights, which I read to [Appellant], and he signed the top. I indicated an X for him to sign the bottom if he waived the rights. He said he did not want to, and I filled out the date and time.

N.T., 9/14/11, at 8–17.

We conclude here, as in *DeJesus,* that Detective Couch's words and actions were "reasonably likely to elicit an incriminating response" from Appellant. In determining that the defendant was subjected to the functional equivalent of an interrogation, the Court in *DeJesus* considered the fact that the police informed the defendant that he had been implicated in a crime, told the defendant what statements had been made by others concerning the defendant's involvement in the crime, and told the defendant of charges the Commonwealth was prepared to bring against him. *DeJesus,* 787 A.2d at 401–404. Here, as in *DeJesus,* Appellant was subjected to the functional equivalent of an interrogation when Detective Couch explained to Appellant that a warrant for his arrest had been issued for obstructing the administration of law, told Appellant about the statements against him that his supervisors had made to the police, informed Appellant that police had interviewed the people involved, including the people Appellant had told about the impending search warrants, and informed Appellant that the police had received written statements incriminating Appellant. As in *DeJesus,* Detective Couch should have known that these statements were reasonably likely to evoke an effort on Appellant's part to defend himself and give his own version of his involvement in the crimes at issue. *See also Gaul, supra* (police investigator should have known that his comments were reasonably likely to evoke an incriminating response when, without issuing *Miranda* warnings, he acknowledged that the defendant was in custody, asked the defendant if he wanted to discuss the pending charges, presented the defendant with the incriminating statements made against him as well as the charges against him, and repeatedly acknowledged that he would have to give defendant *Miranda* warnings, indicating that the police officer knew that his conduct was likely to evoke a response).

While the present case does differ from *DeJesus* in that the interview with Detective Couch was of a far shorter duration, and the record does not indicate that Appellant was repeatedly informed of the charges against him, our Supreme Court explained in *Gaul* that such differences are "distinctions without a difference" and "have limited relevance ... to our determination of whether a police officer engaged in a practice he should have known is reasonably likely to evoke an incriminating response." *Gaul,* 912 A.2d at 256. Because we conclude that Appellant, here, was subjected to the functional equivalent of a custodial interrogation, his incriminating statements made prior to the administration of *Miranda* warnings, should have therefore been suppressed.

The Commonwealth notes however that in *DeJesus,* our Supreme Court found that even if the defendant was subjected to a custodial interrogation without having been provided with *Miranda* warnings, this error was cured by the fact that the defendant was subsequently given *Miranda* warnings and signed a *Miranda* waiver form, after which the defendant allowed the detective to record the defendant's confession. Accordingly, in *DeJesus,* although the police officer's initial interrogation violated *Miranda,* that did not invalidate the defendant's subsequent waiver of his rights and ensuing confession. *DeJesus,* 787 A.2d at 405–407. *See also Commonwealth v. Schwing,* 964 A.2d 8, 13 (Pa.Super.2008)(even if the facts in *DeJesus* would initially afford the defendant relief, he failed to prove that the police officer's conduct tainted and invalidated his subsequent waiver of rights and statement since after the administration of *Miranda* warnings was completed, the officer then reviewed with the defendant his prior statements, which again were conducted and carried out upon videotaped interview); *Commonwealth v. Charleston,* 16 A.3d 505 (Pa.Super.2011) (failure to deliver *Miranda* warnings prior to interrogation did not invalidate incriminating statements made by the defendant after subsequent receipt of *Miranda* warnings and waiver thereof).

In reliance on *DeJesus,* the Commonwealth, here, asserts that even if *Miranda* warnings should have been administered prior to the custodial interrogation, any such violation was cured when Appellant, after making his incriminating statements, was immediately given *Miranda* warnings. We disagree with the Commonwealth.

In *DeJesus,* our Supreme Court held that any violation of *Miranda* was cured when, after eventually being provided with *Miranda* warnings, the defendant voluntarily waived his rights and then reiterated or reaffirmed his incriminating statements. *See also Schwing,* and *Charleston, supra.* In the present case, however, after making an incriminating statement and subsequently being provided with *Miranda* warnings, Appellant declined to sign a *Miranda* waiver, immediately refused to make any more statements, and did not reaffirm his previous incriminating statement. Rather, Appellant only stated "I said what I said" and informed Detective Couch he would not say any more. N.T., 9/14/11, at 17. Because Appellant's initial incriminating statements were unlawfully elicited prior to the administration of *Miranda* warnings, those statements should have been suppressed. Since Appellant neither reiterated nor reaffirmed his incriminating statements after being provided with *Miranda* warnings, evidence of such incriminating statements should not have been permitted at trial.

Our inquiry, however, does not end here. We must still determine whether Appellant is entitled to a new trial. In *Commonwealth v. Henry,* 410 Pa.Super. 324, 599 A.2d 1321, 1326 (1991), we explained that the U.S. Supreme Court in *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) "made clear that the erroneous admission of a confession can be constitutionally harmless, even if the confession was coerced." *Henry,* 599 A.2d at 1326 (holding that, beyond a reasonable doubt, the erroneous admission of appellant's oral confession to a police officer was harmless because the Commonwealth's evidence against appellant was overwhelming, and the situation was not one where it would be difficult or impossible to successfully prosecute absent the defendant's admissions, or where the improperly obtained confession led to the admission of other prejudicial evidence;

rather the confession merely confirmed for the police what they already had probable cause to believe).

Based on our thorough review of the record in this case, we conclude the admission of Appellant's incriminating statement was harmless in light of the overwhelming nature of the other evidence against Appellant. In particular, the Commonwealth at trial presented the testimony of Detective Couch who testified that Appellant was invited to the December 29, 2010 meeting with the Aliquippa police at which time the issuance of search warrants for the Valley Terrace apartment complex was discussed. N.T., 9/15/11, at 7–13. Roger Henderson then testified that on January 1, 2011, Appellant knocked on the door of Mr. Henderson's residence at the Valley Terrace apartment complex and in a "real frantic" manner, informed Mr. Henderson that he had been fired from his employment at Valley Terrace, and that "the police had a search warrant for [Mr. Henderson's] house and two, three other houses in that complex in that building." N.T., 9/14/11, at 79–82. Mr. Henderson testified that he in turn informed other residents of Valley Terrace about the impending search warrants. *Id.* at 83. Mr. Henderson further testified that on January 2, 2011, he encountered Mr. Allman and Mr. English of Victory Security, and asked them if Appellant had been telling the truth about the impending search warrants. *Id.* at 84–85. Mr. Henderson testified that he subsequently spoke with the police and gave them a written statement about his conversation with Appellant with regard to the search warrants. *Id.*

Mr. Allman corroborated Mr. Henderson's testimony, testifying that on January 1, 2011, he and Mr. English were engaged in a verbal dispute with Appellant after which Mr. Allman instructed Appellant not to return in his capacity as a Valley Terrace security guard. *Id.* at 56–58.[4] Thereafter, on January 2, 2011, while patrolling the apartment complex, Mr. Allman and Mr. English encountered Mr. Henderson and, following a conversation with Mr. Henderson, Mr. Allman filed a report with the Aliquippa Police with regard to what Mr. Henderson had told him. *Id.* at 57–58. This testimony was corroborated by James English. *Id.* at 73–75. Finally, Detective Couch testified that on January 2, 2011, Mr. Roberts and Mr. Allman of Victory Security, reported to him that the search warrants had been compromised. N.T. 9/15/11, at 14–15. Detective Couch directed Mr. Allman to file a police report, and interviewed Mr. Allman, Mr. English and Mr. Henderson before filing charges against Appellant for obstructing the administration of law. *Id.* at 1517.

Given the overwhelming nature of the foregoing evidence, we are satisfied, beyond a reasonable doubt, that the admission of Appellant's incriminating statements to Detective Couch constituted harmless error. In light of the Commonwealth's multiple witnesses who testified that Appellant knew of the impending search warrants, and disclosed that information to Mr. Henderson, Appellant's incriminating statement to Detective Couch "merely confirmed for the police what they already had probable cause to believe." *Henry, supra.* Therefore, we conclude that the admission of appellant's incrimina-

---

4. Mr. Allman subsequently testified that he did not have authority to actually fire Appellant from his employment at Victory Security. Rather, Mr. Allman stated that he only had the authority to prevent Appellant from working at the Valley Terrace apartment complex, but that Appellant could have been reassigned by Victory Security to work at a different location. N.T., 9/14/11, at 63.

ting statement was harmless, and Appellant is not entitled to a new trial. *See also Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 720 (1998)("A suppression court's error regarding failure to suppress statements by the accused will not require reversal if the Commonwealth can establish beyond a reasonable doubt that the error was harmless.")

■■■■■ In his second issue, Appellant argues that the evidence was insufficient to support his conviction of obstructing the administration of law or other governmental function under 18 Pa.C.S.A. § 5101. Appellant's Brief at 18–21. Our standard of review with regard to this challenge is as follows:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact,

while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Devine*, 26 A.3d 1139, 1145 (Pa.Super.2011).

The offense of obstructing the administration of law or other government function is defined as follows:

A person commits a misdemeanor of the second degree if he *intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act*, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

18 Pa.C.S.A. § 5101 (emphasis added).

In evaluating § 5101 convictions, our courts have explained that § 5101 is substantially based upon the Model Penal Code section 242.1. *Commonwealth v. Neckerauer*, 421 Pa.Super. 255, 617 A.2d 1281, 1287 (1992). As stated in the comment to section 242.1 of the Model Penal Code "[t]his provision is designed to cover a broad range of behavior that impedes or defeats the operation of government." *Commonwealth v. Trolene*, 263 Pa.Super. 263, 397 A.2d 1200, 1202 (1979).

Here, Appellant argues, as a matter of law, that because his actions did not fall within any of the conduct prescribed by § 5101, he could not be convicted of obstructing the administration of law. Appellant's Brief at 18–21.[5] In particular,

---

5. The trial court agreed, and the Commonwealth does not contest that Appellant did not

Appellant argues that the question of whether his actions could be considered "physical interference or obstacle" or "breach of an official duty" is a question of law heretofore undecided by our appellate courts. *Id.* With respect to the charge of "physical interference or obstacle", Appellant claims that his actions in merely verbally informing Mr. Henderson about the impending search warrants cannot be classified as s "physical" act within the meaning of the statute. With respect to the charge of "breach of official duty", Appellant argues that because he was employed by a private security firm, he was not acting in any "official" capacity and therefore cannot be found to have "breached an official duty." *Id.* Accordingly, Appellant argues that because he did not use force or violence, physically interfere with or obstruct the execution of the search warrants, breach an official duty, or commit any other unlawful act, his § 5101 conviction is unsupported by the evidence, and that his conviction cannot be upheld, as a matter of law.

The trial court, however, declined to rule as a matter of law that Appellant's actions did not constitute "physical" interference or "breach of an official duty". Rather, the trial court submitted the question to the jury, instructing them as follows:

[I]n order for [Appellant] to be found [guilty] requires that you [the jury] find the following elements have been proven beyond a reasonable doubt.

First that [Appellant] obstructed the administration of law or obstructed a governmental function, and, of course, in this particular case, it's specifically charged that the obstruction involved him revealing privileged information re-

garding search warrants in a homicide investigation.

Generally speaking, a person cannot commit this crime unless he uses means that affirmatively interfered with governmental functions. Thus, you cannot find [Appellant] guilty if you find that he merely tried to avoid complying with the law without affirmatively attempting to interfere with a government function. The Commonwealth must prove something more than just, for example, that [Appellant] fled from the scene of a crime, refused to submit to an arrest, or did not perform a legal duty. As to this last example, however, if [Appellant] was a public official charged by law with the obligation to perform that duty, his failure to perform that duty may be sufficient.

Whether an actual obstruction occurred is not required because the intentional, although unsuccessful, attempt to bring about that result is also covered by this offense. So that is the first element that must be proven beyond a reasonable doubt.

The second element that must be proven beyond a reasonable doubt is that [Appellant] did so obstruct by unlawful, physical interference or obstacle or breach of official duty.

And the third element that must be proven beyond a reasonable doubt is that [Appellant] did so intentionally, that is that he acted with the conscious object of causing such an obstruction.

N.T., 9/15/11, at 102–104. *See also N.T.,* 9/15/11, at 46–62.

Appellant contends that, as a matter of law, his actions did not constitute "physical" interference or "breach of official duty." Our courts have not expressly ad-

___

use "force" or "violence", or "commit an unlawful act" pursuant to § 5101. Thus, the only remaining bases for a § 5101 violation

are "physical interference" or "breach of official duty." *See* Trial Court Opinion, 3/8/12, at 9.

dressed the question of whether obstruction of law must be "physical" and not merely "verbal", or what constitutes "breach of official duty" in violation of § 5101. Nor does the statute itself define what constitutes "physical" interference or define what an "official duty" is. There are however, various Pennsylvania cases pertaining to 18 Pa.C.S.A. § 5101. Although none are factually identical, their analysis is informative.

In *Commonwealth v. Trolene*, 263 Pa.Super. 263, 397 A.2d 1200 (1979), the appellant was convicted of obstruction of the administration of law after he went into the chambers of a trial judge and made statements to the judge that were intended to influence the judge's decision in an pending criminal matter involving a third party. We held in *Trolene* that "section 5101 includes intentional albeit unsuccessful attempts to influence, obstruct, or delay the administration of law." *Trolene*, 397 A.2d at 1204. Thus, in *Trolene*, we concluded that the appellant's actions in travelling to the judge's chambers and attempting to verbally influence the judge's decision were sufficient to sustain the conviction for obstruction of law. *Id.*

Here, the Commonwealth accuses Appellant of obstructing the administration of law when he went to Mr. Henderson's apartment, and informed Mr. Henderson that the police were planning to execute search warrants. After consideration of the existing body of case law, and in reliance on our disposition in *Trolene*, we conclude that the evidence that Appellant actively travelled to Mr. Henderson's residence to inform him about the search warrants was sufficient to support Appellant's conviction for obstructing the administration of law by "physical interference". *See also Commonwealth v. Scarpone*, 535 Pa. 273, 634 A.2d 1109, 1113 (1993)(there is no persuasive authority in this Commonwealth that in order for § 5101 to apply, "there must be some sort of physical interference with the [government official] as they perform[ed] their duties"); *Commonwealth v. Mastrangelo*, 489 Pa. 254, 414 A.2d 54 (1980), (upholding a § 5101 conviction where, after the defendant received a parking ticket on Bridge Street, he verbally abused the parking enforcement officer, and the defendant's conduct frightened the parking enforcement officer and caused her not to patrol Bridge Street the following week).[6]

■ We turn next to Appellant's assertion that he did not breach an "official duty" because he was not acting in an "official" capacity and was under no "official duty" when he informed Mr. Henderson about the impending search warrants. The cases in this Commonwealth that concern violations of § 5101 for breach of official duty generally pertain to public servants who act in a manner that conflicts with their governmental duties. *See Commonwealth v. Gentile* (upholding district justice's conviction pursuant to § 5101 after district justice asked a

---

**6.** *But see Commonwealth v. Gettemy*, 404 Pa.Super. 504, 591 A.2d 320 (1991)(where defendant, when questioned by police, denied knowledge of a missing woman and her motor home, but was later found to have made untruthful statements to police, defendant had not obstructed the administration of law by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, and could not be found to have violated 18 Pa.C.S.A. § 5101); *Commonwealth v. Shelly*, 703 A.2d 499 (Pa.Super.1997)(supplying a false name to the police officers did not constitute a violation of § 5101 where the defendant was a passenger in a car that was stopped by police officers, for speeding, and provided a false name to police; the defendant did not commit an "unlawful act" because, while falsity is a crime in certain circumstances, the legislature had not made it a statutory offense to supply a false name to police).

police chief to rewrite a speeding ticket); *Commonwealth v. Booth*, 291 Pa.Super. 278, 435 A.2d 1220 (1981)(upholding § 5101 conviction of sheriff of Susquehanna County and warden of the county jail after he was found to have provided alcohol to an inmate and permitted the inmate to escape). Here, however, the evidence of record indicates that Appellant was not a government official. After careful review, we are unable to find any cases pursuant to § 5101 that extend criminal liability for "breach of official duty," to individuals who are not government officials. In the absence of clear guidance from our Supreme Court or the Legislature, we therefore decline to extend criminal liability under § 5101 for "breach of official duty" to members of the public who are not government officials. To hold otherwise could have potentially far-reaching consequences regarding the criminal liability of ordinary citizens of this Commonwealth in their interactions with police. *See Moses v. T.N.T. Red Star Exp.*, 725 A.2d 792, 801 (Pa.Super.1999)("It is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines. Such is a province reserved to the Supreme Court ... [the Superior Court], being an error correcting court, will affirm trial court decisions which are in accord with principles of law adopted by prior appellate court decisions"). Accordingly, we conclude that the evidence was insufficient to sustain a conviction for obstruction of the administration of law by breach of official duty.

As we have discussed above, however, we conclude that the evidence was suffi-

cient to sustain Appellant's conviction for obstruction of the administration of law by "physical" interference. Viewing all the evidence admitted at trial in the light most favorable to the verdict winner, the jury could have reasonably concluded that Appellant's actions in travelling to Mr. Henderson's apartment, knocking on the door, and informing him about the search warrants, constituted "physical" interference with the administration of law. Therefore, we affirm the judgment of sentence.[7]

Judgment of sentence affirmed.

Judge STRASSBURGER files a Concurring/Dissenting Opinion.

CONCURRING AND DISSENTING OPINION BY STRASSBURGER, J.:

I agree with the Majority that the admission of Appellant's incriminating statements was a violation of Miranda; but, in this case, was harmless error. However, I disagree with the Majority that the evidence was sufficient to convict Appellant under 18 Pa.C.S.A. § 5101 and respectfully dissent.

The offense of obstructing the administration of law or other government function is defined as follows:

A person commits a misdemeanor of the second degree if he *intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act,* except that this section does not apply to flight by a person

---

**7.** *See Griffin v. United States*, 502 U.S. 46, 49, 54–56 112 S.Ct. 466, 469, 116 L.Ed.2d 371 (1991) (holding that a general jury verdict is valid so long as the verdict is legally supportable on one of the submitted grounds, even though there is no assurance that a valid ground, rather than an invalid one, was actu- ally the basis for the jury's decision; but distinguishing general verdicts that include charges that are legally invalid for either constitutional or statutory reasons and therefore must be overturned, from general verdicts that include charges which are factually unsupported).

charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

18 Pa.C.S.A. § 5101 (emphasis added).

The Majority concludes "that the evidence that Appellant actively travelled to Mr. Henderson's residence to inform him about the search warrants was sufficient to support Appellant's conviction for obstructing the administration of law by 'physical interference.'" Majority Opinion, at 177. I disagree that Appellant's actions constitute "physical interference" within the meaning of the statute.

The Statutory Construction Act provides that "[g]eneral words shall be construed to take their meanings and be restricted by preceding particular words." 1 Pa.C.S. § 1903(b). Furthermore, "[u]nder the doctrine of *noscitur a sociis* the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it." *Ford Motor Co. v. Unemployment Comp. Bd. of Review*, 168 Pa.Super. 446, 79 A.2d 121, 123 (1951).

In the statute, the term "physical interference" is preceded by the words "force" and "violence" and followed by the word "obstacle." The logical conclusion is that the "physical interference" must be in the nature of using force and/or violence to create an obstacle. Thus, when Appellant travelled to Mr. Henderson's home to inform him about the search warrants, he did not engage in a "physical interference" within the meaning of the statute. Accordingly, I respectfully dissent.