J-S57037-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| JEFFREY CHRIS CHEHOVITS, | : | |
| | : | |
| Appellant | : | No. 140 WDA 2016 |

Appeal from the Judgment of Sentence September 30, 2015
in the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0001684-2014

BEFORE:   FORD ELLIOTT, P.J.E., SHOGAN, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:   **FILED SEPTEMBER 15, 2016**

Jeffrey Chris Chehovits (Appellant) appeals from the September 30, 2015 judgment of sentence imposed after the trial court found him guilty of aggravated assault, prohibited offensive weapons, simple assault, and recklessly endangering another person (REAP).  We affirm.

The trial court made the following findings of fact.

> On September 5, 2014, Christopher Murray went to Talerico's Bar in Ambridge, Beaver County, to celebrate a friend's birthday.  Over the course of the night, Murray consumed several drinks and left the bar at approximately 10:00 p.m.  After leaving, he went to Jacqueline Poore's home at 801 9th Street in Ambridge.  Murray was romantically involved with Poore at the time.  Poore was not at her house when Murray got there.  She joined him around midnight.  Together, they watched television and fell asleep on the couch.
>
> Between 1:30 a.m. and 2:00 a.m. on September 6, 2014, there was a knock on the door.  Poore looked out the door and said, "It's Jeff," referring to Appellant.  Murray had met Appellant

*Retired Senior Judge assigned to the Superior Court.

a few times prior to September 6 at various bars and on a few occasions at Poore's house. On seeing Appellant through the screen door, Murray told Appellant to leave. Murray and Appellant pushed at one another's hands through the screen door.

Murray, who had been sleeping in boxers, put on shorts and walked outside, his belt dangling from his waist. He pulled out his belt, and Appellant asked him if he was going to hit him, Appellant, with the belt. Murray responded that he "might if you don't get out of here." Murray testified that he removed his belt and threw it on the ground. The [c]ourt found this testimony credible and consistent with the belt's location in photographs taken during the ensuing investigation.

Appellant proceeded to his truck, which was parked nearby. Murray shouted after him, telling him not to come back. Murray testified that just as he thought Appellant was leaving, Appellant leaned into his truck and started coming back toward him. Murray saw "something that seemed metallic in [Appellant's] hand," which turned out to be a black Marines fold up knife. According to Murray, he tried to back away as [A]ppellant was swinging at him with the knife in hand. Murray put his hands up to cover his face. Murray realized that the metallic object in Appellant's hand was "a sharp object" and that when the object made contact with Murray's hand, Murray realized that he was "severely injured."

Appellant turned and walked away, while Murray's left thumb was "pretty much flipped over." Murray lay in the street in front of Poore's home, holding his left hand and losing a lot of blood. Appellant left the scene in his vehicle.

Soon after, Officer Timothy Depenhart of the Ambridge Borough Police Department arrived at the scene. He observed Murray holding a towel around his arm. Officer Depenhart called for an ambulance. Poore and Murray told [Officer] Depenhart that it was Appellant who stabbed Murray and that Appellant had left in a vehicle. [Officer] Depenhart detected alcohol on Murray, but Murray was able to answer [Officer] Depenhart's questions. Murray told [Officer] Depenhart that Appellant lives in nearby Economy, Beaver County.

Officer Depenhart put in a call to police in the surrounding area to be on the lookout for Appellant. Soon after, Economy police informed [Officer] Depenhart that they had Appellant in custody outside his residence. [Officer] Depenhart went to Appellant's residence and saw that Appellant had already been placed in custody. Eventually, [Officer] Depenhart was led into Appellant's home and found the knife sitting on the arm of Appellant's couch. Officers placed the knife into evidence.

Trial Court Opinion, 3/9/2016, at 3-5 (citations omitted).

As a result of the incident, Appellant was convicted of the charges indicated above following a bench trial.[1] Appellant was sentenced to an aggregate term of six to 23½ months of imprisonment. Appellant's timely-filed post-sentence motions were denied after a hearing. Thereafter, Appellant timely filed a notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents four questions to this Court:

I.  Whether [] Appellant's convictions for aggravated assault, simple assault, and [REAP] should be reversed because the Commonwealth failed to present sufficient evidence to prove beyond a reasonable doubt that [] Appellant did not act in justifiable self-defense?

II.  Whether [] Appellant's conviction for aggravated assault with a deadly weapon under section 2702(a)(4) and simple assault under section 2701(a)(2) should be reversed because the Commonwealth failed to present sufficient evidence to prove beyond a reasonable doubt that [] Appellant used a deadly weapon?

III.  Whether [] Appellant's conviction for possession of a prohibitive offensive weapon should be reversed because the Commonwealth failed to present sufficient evidence to

---

[1] The trial court found Appellant not guilty of other charges.

prove beyond a reasonable doubt that the knife was a prohibited offensive weapon?

IV. Whether [] Appellant's conviction for [REAP] should be reversed because the Commonwealth [failed] to present sufficient evidence to prove beyond a reasonable doubt that [] Appellant placed another []person in danger of death or serious bodily injury?

Appellant's Brief at 6 (suggested answers and unnecessary capitalization omitted).

As Appellant's questions challenge the sufficiency of the evidence to sustain his convictions, the following applies to our review.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Beasley*, 138 A.3d 39, 45 (Pa. Super. 2016) (quoting

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa. Super. 2011)).

We first address Appellant's argument that he should have been found not guilty of the assault and REAP charges because he acted in self-defense. In so doing, we bear in mind the applicable legal principles:

> While there is no burden on a defendant to prove [a] [self-defense] claim, before that defense is properly at issue at trial, there must be some evidence, from whatever source to justify a finding of self-defense. If there is any evidence that will support the claim, then the issue is properly before the fact finder.
>
> If the defendant properly raises self-defense…, the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant's act was not justifiable self-defense.
>
> The Commonwealth sustains this burden if it establishes at least one of the following: 1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety.

*Commonwealth v. Smith*, 97 A.3d 782, 787 (Pa. Super. 2014) (internal citations omitted).

Here, there is no dispute that Appellant properly placed the issue of self-defense before the trial court. The question is whether the Commonwealth met its burden of disproving it. Appellant, relying upon his trial testimony, argues that the Commonwealth failed to do so:

> The facts of this case lead to the conclusion that [] Appellant did reasonably believe the use of force was necessary. [] Appellant testified that Murray violently shoved at the screen door to the house, breaking the door, and causing the door to hit Appellant. Appellant stated he went to leave because of how violent Murray was acting. Murray himself testified that after the confrontation at the screen door of the residence, he went to put on a shirt and shorts to follow [] Appellant outside, and that []

Appellant was walking away from the house. Murray followed [] Appellant down the walkway from the house, taking his belt off as he went. Murray testified that when Appellant asked him if he was going to hit Appellant with the belt, he admitted that he would if Appellant did not leave. [] Appellant further testified that Murray was screaming, cursing, and air punching and kicking.

There is also evidence that Murray followed [] Appellant to his truck. Despite Murray's testimony that he dropped his belt by the walkway in front of Ms. Poore's house, he instead had it with him throughout the confrontation with [] Appellant. Appellant testified that Murray was holding the belt and came after Appellant while he was attempting to enter his truck to leave. Once at the truck, Appellant testified that he felt a blow to his shoulder, and Murray hung onto Appellant's shirt and pulled it from the front, causing it to rip. Appellant further testified that he grabbed his knife from the door of his truck because Murray raised the belt over his head, swung the belt over [] Appellant's head, and the belt collided with the Appellant's hand so hard it drove the knife into Appellant's hand. Only then did Murray back away from Appellant, and Appellant was able to get into his car to leave without any knowledge of Murray being injured. Officer Depenhart stated that the blood trail began near, or on, the neighbor's property and continued the length of the sidewalk to the walkway of the residence.

The evidence presented at the trial paints a picture that depicts Murray as the initial, and continued, aggressor during the confrontation, and not [] Appellant. Appellant stated that Murray was scaring him, and that he was attempting to leave the premises when Murray [came] after him and actually [swung] the belt so aggressively at Appellant that he had to defend himself. Murray's actions left Appellant with no other choice but to use reasonable force to protect himself from injury.

Appellant's Brief at 14-16 (citations omitted).

It is clear to this Court that Appellant's claim rests upon acceptance of his testimony, and rejection of the contradictory evidence offered by the Commonwealth. This Court will not reweigh evidence or disturb the fact-

finder's credibility determinations. Viewing the evidence in the light most favorable to the Commonwealth, the evidence was sufficient to disprove Appellant's self-defense defense. As the trial court explained:

> The Commonwealth presented the testimony of Christopher Murray and Jacqueline Poore. Together, their testimony established that Appellant (1) had no reasonable belief that he was in imminent danger of death or serious bodily injury and (2) violated a duty to retreat.
>
> Christopher Murray testified that other than the altercation across the screen door, he did not touch Appellant. Murray testified that he did not grab ahold of Appellant's shirt, nor did he rip it. …
>
> The [trial c]ourt, having considered both Murray's and Appellant's testimony, found Murray's and Poore's testimony credible, and found Appellant's testimony not credible and self-serving. Having shown evidence that reasonably permitted the [trial c]ourt to conclude that Appellant did not use deadly force out of a reasonable necessity, the Commonwealth has met its burden.
>
> The inference that Appellant did not act in self-defense is further bolstered by evidence tending to show that Appellant violated his duty to retreat. Neither the victim nor Appellant disputed whether the knife was in Appellant's truck during the initial confrontation at the screen door. Appellant walked towards his truck and withdrew the knife from it. Given the location of the truck, walking toward the truck meant walking away from [Murray]. Instead of acquiescing to Murray's shouts that Appellant "get out of [there]," Appellant walked back toward Murray with the knife in hand and swung the knife towards Murray. According to Murray–and consistent with his injury–Murray put his hands up in a defensive posture to cover his face. In walking back towards his truck, Appellant showed that he had the opportunity to leave the confrontation without further incident. Had Appellant gotten in his truck and drove [*sic*] away instead of escalating [the situation] by grabbing a knife, the assault would not have occurred.

- 7 -

The Commonwealth presented sufficient evidence for the [trial c]ourt to conclude that Appellant (1) did not reasonably believe he was in danger of imminent death or serious bodily injury and (2) violated a duty to retreat. This evidence–which the [trial c]ourt found persuasive–necessarily defeats Appellant's attack on the sufficiency of the evidence, and therefore must fail.

Trial Court Opinion, 3/9/2016, at 8-11 (citations and footnote omitted).

Accordingly, Appellant's first issue entitles him to no relief from this Court.

Appellant next claims that his assault convictions[2] cannot stand because the Commonwealth failed to prove that he used a deadly weapon. Appellant does not contend that the knife found at his home by Officer Depenhart falls outside of the definition of a "deadly weapon."[3] Rather, he contends that "there is a lack of evidence connecting the recovered knife to the incident involving Murray." Appellant's Brief at 16-17. Appellant's argument is as follows:

Officer Depenhart testified that he did not have the knife examined for fingerprints or DNA evidence, nor did he have any of the evidence collected from the scene taken to a lab for testing. The only witness for the Commonwealth who testified

---

[2] 18 Pa.C.S. § 2702(a)(4) ("A person is guilty of aggravated assault if he: … attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon…."); 18 Pa.C.S. § 2701(a)(2) ("[A] person is guilty of assault if he: … negligently causes bodily injury to another with a deadly weapon….").

[3] "Any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury." 18 Pa.C.S. § 2301.

regarding the object used was Murray, and his statements did not prove beyond a reasonable doubt that a deadly weapon had been used. Murray did not identify the knife, and had only stated that during the altercation, he felt something sharp and saw something metallic. This is less than circumstantial evidence. There was no direct testimony as to what actually caused Murray's injuries.

With a lack of DNA or fingerprint evidence, and the victim being unable to specifically identify what he saw, there is not enough evidence to prove beyond a reasonable doubt that the knife recovered by Officer Depenhart was the object that caused Murray's injuries. The [trial c]ourt should not be left to guess what object caused the injuries; if it is, the Commonwealth has not met its burden of proving a deadly weapon caused Murray's injuries.

Appellant's Brief at 17.

We disagree. First, the trial court's inference that the sharp, metallic object that nearly severed Murray's thumb was in fact the knife that shortly afterwards was recovered from the arm of Appellant's couch is abundantly reasonable. *See Commonwealth v. Sawyer*, 357 A.2d 587, 590 (Pa. Super. 1976) (holding testimony from victim, who sustained a cut hand, that Sawyer approached him with a "shiny metal object," coupled with evidence that a knife was recovered nearby, was sufficient to support inference that Sawyer attacked the victim with the knife). Second, we consider all of the evidence actually received in reviewing a sufficiency challenge, and Appellant himself testified that he grabbed his knife from the door of his vehicle and used it in his confrontation with Murray. N.T., 6/2/2015, at 193. Thus, contrary to Appellant's assertion, the trial court did not have to guess what

caused Murray's injuries because Appellant identified the weapon. Appellant's second claim is meritless.

Next, Appellant suggests that the knife recovered from his home does not qualify as a prohibited offensive weapon under 18 Pa.C.S. § 908, which prohibits, *inter alia*, the possession of any "knife, razor or cutting instrument, the blade of which is exposed in an automatic way by switch, push-button, spring mechanism, or otherwise…." 18 Pa.C.S. § 908(c). Appellant argues that the knife in question does not fall within the scope of subsection 908(c) for two reasons: (1) the blade "has the ability to stay closed on its own; nothing holds the blade closed," and (2) although there is a spring within the knife, it merely "assists with the manual opening of the blade" rather than opening the blade automatically. Appellant's Brief at 18.

The trial court addressed Appellant's argument as follows:

> On the shaft of the knife, where a user would grip, the knife has a lever that exposes the blade in an automatic manner. The lever is part of the blade itself. A spring mechanism makes the knife flip up into an exposed position. … Here, the knife is exposed automatically once the user puts his or her finger into the control that is part of the knife's blade. The blade does not need to be manipulated manually in order for it to flip out of the handle.

Trial Court Opinion, 3/9/2016, at 15 (citations omitted).

We agree: the fact that the knife's blade goes from a state of full concealment to being fully exposed upon the application of pressure on a lever places the knife squarely within the definition of a prohibited offensive

- 10 -

weapon. ***Cf. Commonwealth v. Ashford***, 397 A.2d 420 (Pa. Super. 1979) (plurality opinion) (holding knife did not fall within the prohibition of subsection 908(c) where it was "exposed by a flick of the wrist," not by a lever or switch, and then only after a lock was released). We are unpersuaded by Appellant's argument that, because some action by the user is required before the blade springs open, the knife is outside the realm of "automatic." Appellant is entitled to no relief on his third claim.

Lastly, Appellant contends that the Commonwealth failed to produce sufficient evidence to sustain his REAP conviction.

"A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705.

> [S]erious bodily injury is defined as bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. To sustain a conviction for [REAP], the Commonwealth must prove that the defendant had an actual present ability to inflict harm and not merely the apparent ability to do so. Danger, not merely the apprehension of danger, must be created. The *mens rea* for recklessly endangering another person is a conscious disregard of a known risk of death or great bodily harm to another person.

***Commonwealth v. Martuscelli***, 54 A.3d 940, 949 (Pa. Super. 2012) (internal quotation marks and citations omitted).

Here, Appellant claims that there was insufficient evidence that he acted with the required *mens rea*. Appellant's Brief at 19. Relying wholly on

his own testimony, which was rejected by the trial court, Appellant maintains that he "in no way exercised a conscious disregard of a potential risk of great bodily injury to Murray, by attempting to protect himself from Murray's attacks[.]" *Id.*

Properly viewing the evidence in the light most favorable to the Commonwealth as verdict-winner, Appellant, who is 6'4" and weighed more than 260 pounds, retrieved a knife from his vehicle; exposed the blade; swung it at 6'1"-and-185-pound Murray, while in close proximity to Murray; and nearly cut off one of Murray's digits, causing significant blood loss, requiring multiple surgeries, and leaving Murray permanently impaired. That is sufficient evidence to sustain his REAP conviction. *See*, *e.g.*, ***Commonwealth v. Moore***, 395 A.2d 1328, 1332 (Pa. Super. 1978) (sustaining REAP conviction where 265-pound defendant beat the rear end of his 7-year-old stepson with a stick, bruising him so badly that he could not stand and required extended hospitalization).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 9/15/2016